ESTATE OF HARRY D. CRANE, DECEASED, HATTIE SCHERBACK, INDEPENDENT EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Crane v. Commissioner
Docket No. 3716-80.
United States Tax Court
T.C. Memo 1982-174; 1982 Tax Ct. Memo LEXIS 575; 43 T.C.M. (CCH) 994; T.C.M. (RIA) 82174; April 6, 1982. Sam J. Dealey and Jack W. Hawkins, for the petitioner. Deborah A. Butler, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: *576 Respondent determined a deficiency in the amount of $ 59,834.15 in petitioner's Federal estate tax. After concessions by both parties, the sole issue for decision is whether, under section 2042(2), [1] one-half of the proceeds of a life insurance policy on the decedent's life is includable in the decedent's gross estate. FINDINGS OF FACT When she filed her petition, Hattie Crane Scherback (hereinafter Mrs. Crane), executrix of the estate of Harry D. Crane, resided in Duncanville, Texas. At the time of Harry D. Crane's (Mr. Crane or decedent) death on May 9, 1976, Mr. and Mrs. Crane were husband and wife; Mrs. Crane has since remarried. She timely filed for the decedent's estate an estate tax return which was received by the Internal Revenue Service Center, Austin, Texas, on February 4, 1977.
At the time of his death, Mr. Crane had taken a leave of absence from employment with Texas Instruments Co. and was engaged in cattleraising. Mrs. Crane worked as a real estate broker, dealing in farms and ranches in Texas, Arkansas, Oklahoma, and *577 Louisiana. The markets in both the real estate and cattle businesses were not good in 1976. At the time of decedent's death, the Cranes had substantial indebtedness. As reported on decedent's estate tax return, real estate was mortgaged at a sum roughly equivalent to its value, and the face amount of decedent's life insurance (excluding that of the Connecticut General Life Insurance Company policy here in issue) roughly equaled the marital community's debts.[2]
On April 19, 1976, the Cranes, along with their two children, met with Robert Hancock (Mr. Hancock), a life insurance salesman with Connecticut General Life Insurance Company (Connecticut General). This meeting was initiated by Mrs. Crane for the purpose of obtaining additional insurance on Mr. Crane's life. The Cranes and Mr. Hancock discussed the estate tax implications of life insurance and community property and specifically discussed the circumstances in which life insurance proceeds would *578 be excluded from Mr. Crane's estate. The Cranes agreed that Mrs. Crane should be the owner, as her separate property, of any policy that was issued. At this meeting on April 19, 1976, an application form was filled out (file No. 779241) to obtain a policy insuring Mr. Crane's life for a 1-year term in the amount of $ 300,000 and additional indemnity of $ 75,000. The application form designates Mrs. Crane as "primary beneficiary" and as "owner." By a mark in the appropriate box, it is stated that quarterly premium notices were to be sent "to Owner and not to Insured." Further, again by a marked box, the application states that as owner, Mrs. Crane was to have "the right to change the Beneficiary and to exercise all other policy rights." The application was signed by Mr. Crane as "Proposed Insured," by Mrs. Crane as "Applicant if other than Proposed Insured," and by Mr. Hancock as "Witness." Preceding the signatures is the statement-- I (We) have read the above questions and answers and hereby declare that they are complete and true. I (We) agree that this application * * * shall form a part of any policy issued. * * * As payment on account of the initial premium, a check *579 made payable to Connecticut General in the amount of $ 750 was drawn on the Cranes' joint checking account at the First National Bank in Clarksville, Texas. The face of the check was altered; in the two places where the printed names of the joint account holders appeared, black marks were used to obliterate Mr. Crane's name, leaving only Mrs. Crane's name legible. The check was signed by Mrs. Crane and was acknowledged by a conditional receipt signed by Mr. Hancock. On April 22, 1976, a brief telephone call was made from the Crane's residence to the First National Bank in Clarksville regarding a possible change of the joint account on which the insurance premium check was drawn to a separate account in Mrs. Crane's name. Similar brief calls to the bank were made on April 13 and 19, 1976. The signature cards were not changed. Mr. Crane was killed accidentally on May 9, 1976, by a gunshot wound in the heart, prior to the actual issuance of the insurance policy. Connecticut General paid $ 310,000 pursuant to the contract rights acquired by reason of the insurance application; no part of these proceeds was included as part of the gross estate as reported in decedent's estate *580 tax return. Respondent determined that one-half of the value of the proceeds is includable in decedent's gross estate under section 2042. [3]
OPINION Under section 2042, [4] the value of a decedent's gross estate includes the proceeds of insurance policies on the decedent's life which are receivable by beneficiaries other than the decedent's executor [5] if, at the time of his death, the decedent possessed any "incidents of ownership [in the policy], exercisable either alone or in conjunction with any other person." Where, however, the decedent did not possess any such incidents of ownership at the time of his death, and the executor is not the beneficiary, then no part of the proceeds is includable in the decedent's gross estate under section 2042. Sec. 20.2042-1(c), Estate Tax Regs. *581 The term "incidents of ownership" is not limited to ownership in a technical legal sense.In general terms, it refers to the right of the insured or his estate to the economic benefits of the policy. As explained in section 20.2042-1(c)(2), Estate Tax Regs., the term includes-- the power to change the beneficiary, to surrender or cancel the policy, to assign the policy, to revoke an assignment, to pledge the policy for a loan, or to obtain from the insurer a loan against the surrender value of the policy, etc. A decedent possesses the "incidents of ownership" of a policy not only *582 if, under the terms of the policy, he has these policy rights at his death but also if he is deemed to possess any incidents of ownership in the policy, in whole or in part, under the State law as applied to the policy. Sec. 20.2042-1(c)(5), Estate Tax Regs. [6]
Under Texas community property law, life insurance, like other property, [7] purchased with community funds is presumed to belong to the community even though title is taken in the name of one spouse only. Freedman v. United States,382 F.2d 742, 746 (5th Cir. 1967); Brown v. Lee,371 S.W.2d 694, 696 (1963); see Magee v. Young,145 Tex. 485, 198 S.W.2d 883 (1946). This presumption may be rebutted, however, by showing that the decedent performed an affirmative act evidencing his intent to transfer "every incident of ownership" to his spouse, thus "effectuating *583 a gift of his community interest to her." Person v. United States,460 F.2d 228, 232 (5th Cir. 1972); Bintliff v. United States,462 F.2d 403, 406 (5th Cir. 1972); see Freedman v. United States,supra at 745. Essentially, the controversy in this case is factual. The issue is whether there is sufficient evidence to rebut the *584 presumption that the policy was community property.This issue turns on whether the evidence shows that Mr. Crane intended to, and did, give his community interest in the policy to his wife, thus divesting himself of every incident of ownership. We hold that the evidence is sufficient to establish such a gift and divesture so that the value of the proceeds is not includable in Mr. Grane's gross estate. The Fifth Circuit has evaluated alleged gifts of life insurance under Texas law in two signal cases, Freedman v. United States,supra, and Parson v. United States,supra. The opposite results reached in those two cases turned on the factual issue of donative intent. In Freedman, the decedent-wife applied for a $ 50,000 life insurance policy on her life, naming her husband, the then statutory manager of the community, as beneficiary. Mrs. Freedman signed the application as "proposed insured," and Mr. Freedman signed as "owner." As owner, he was entitled to "all [of the policy's] benefits, values, rights and privileges," which otherwise would belong to the proposed insured. Freedman v. United States,supra at 743, fn. 3. *585 [8] The premiums were paid with community funds (382 F.2d at 744). At Mrs. Freedman's death, her husband attempted to exclude from her gross estate the proceeds paid to him as beneficiary.
The court acknoledged that Mrs. Freedman's act of signing as proposed insured and agreeing to the policy's terms "arguably reflected an intention to make a gift of any interest she might have to the person designated as owner." Freedman v. United States,supra at 747. The court, however, considered that this alone constituted insufficient evidence of donative intent because the decedent failed to "perform an affirmative act which would clearly reflect an intention to make a gift of her community share" (382 F.2d at 747). Her "acquiescence" in her husband's signing as owner and "noninterference" with his control did not meet the evidentiary burden *586 (382 F.2d at 747). Moss v. Gibbs, 370 S.W.id 452 (1963). Thus, the court concluded that "it must be assumed that she merely agreed for the policy to be owned by Mr. Freedman as the community's [managing] agent." Freedman v.United States,supra at 747. As we read the opinion, Mr. Freedman's position as the community's managing agent under Texas law influenced the court of appeals in reaching its decision (382 F.2d at 746-747, fns. 8, 9, and 10). In Parson v. United States,460 F.2d 228 (5th Cir. 1972), an assumption that the surviving spouse, the widow, became owner of the policy on behalf of the community was not made, and all of the proceeds of the life insurance policy were excluded from the decedent's gross estate. In Parson, decedent Dr. Parson applied for a $ 50,000 policy covering his accidental death, paying the premiums with community funds. When applying for the policy, the decedent executed a form, divesting himself of "all right and title * * * and every incident of ownership" in favor of his wife. [9] The court distinguished the situation from that in Freedman, because, it stated, "Dr. *587 Parson was forced to make a conscious decision between irrevocably assigning all rights, title and every incident of ownership to Mrs. Parson, or expressly retaining ownership and naming a beneficiary" (460 F.2d at 231). If no effect was given to this assignment and the proceeds were includable in his estate, then, the court reasoned, Dr. Parson "performed a useless act" (460 F.2d at 231). Instead of ignoring the "realities of the situation," the Fifth Circuit concluded that this act of assignment constituted "a positive affirmative act which * * * clearly reflected an intention to make a gift of his community share". (460 F.2d at 232). *588 After the Freedman and Parson cases were decided, the Texas legislature repealed the provision giving the husband sole management authority of community property, Tex. Rev. Civ. Stat. Ann. art 4621 (1969). Instead, the legislature provided, effective January 1, 1974, a system whereby certain types of community property are subject to either spouse's sole management but, with those exceptions, the remainder of the community estate is "subject to the joint management, control, and disposition of the husband and wife, unless the spouses provided otherwise by power of attorney in writing or other agreement" Tex. Fam. Code Ann. sec. 5.22 (1975) [10] Such "other agreement" may be oral.. LeBlanc v. Waller,603 S.W.2d 265, 267 (Tex. Civ. App. 1980). *589 Under this Texas statute, the Cranes might have agreed merely to vest management of the policy in Mrs. Crane. There is, however, simply no evidence of any agreement, oral or written, that Mrs. Crane was to take over the management of the policy on behalf of the community. All the evidence is directly to the contrary. It shows she was to become sole owner of the policy. Moreover, the policy was a 1-year term policy with additional accidental indemnity. As such, it would have little or no cash surrender or other "policy rights" value, and there is no evidence to suggest that the Cranes expected or planned to use the policy for community purposes. Cf. Bintliffv. United States,462 F.2d 403, 407 (5th Cir. 1972); Prichard v.United States,397 F.2d 60, 63-64 (5th Cir. 1968). The only real value of the policy was thus the right to its proceeds. Because of the difference in the potential estate tax consequences, of which, as we shall discuss, the Cranes were fully aware, acceptance of petitioner's contention that the Cranes intended the policy to be Mrs. Crane's separate property is wholly reasonable. The language in the insurance application *590 signed by Mr. and Mrs. Crane may not be quite as explicit in some respects as that signed in the Parson case (see fn. 9, supra) but it follows somewhat more closely the substance of section 2042(2) than does the control clause in the Freedman policy (fn. 8, supra). The application signed by the Cranes designated Mrs. Crane as "owner" and "primary beneficiary"; the Cranes thus agreed that she was to receive the proceeds of the policy. The application further stated that, as "owner," she was to have "the right to change the Beneficiary and to exercise all other policy rights." The meaning of the term "policy rights," as used in the insurance industry, was explained in Commissioner v. ChaseManhattan Bank,259 F.2d 231, 245-246 (5th Cir. 1958), revg. and remg. 25 T.C. 617 (1955), as follows: Policy-rights include the whole bundle of incidents of ownership of property in a policy--all the rights except the right to the proceeds. This bundle includes all "the economic benefits of the insurance, the cash surrender value, the power to change the beneficiary, the power to surrender or cancel the policy, the power to assign the policy *591 or revoke an assignment, the power to pledge the policy for a loan, the power to obtain from the insurer a loan against the surrender value of the policy." [Fn. ref. omitted.] Thus, Mr. Crane, by signing the insurance application, [11] which he thereby agreed was to become "a part of any policy issued," signified his agreement that Mrs. Crane was to possess the incidents of ownership, and to be entitled to the proceeds of the policy. The circumstances in which this application was signed by the Cranes demonstrates that Mr. Crane thus took the required affirmative action to cause the policy to be Mrs. Crane's separate property. *592 Mr. Hancock, the insurance agent who wrote the policy, testified [12] that he explained, first over the telephone to Mrs. Crane separately and then in person to the Cranes together, the estate tax implications of ownership of the policy. According to Mr. Hancock, Mr. Crane actively participated in the discussion concerning separate ownership and agreed that the policy should be Mrs. Crane's separate policy. Mr. Hancock had no doubt on the basis of his observations that Mr. Crane intended to renounce every interest in the policy in favor of his wife, and that the policy should be her separate property. Mr. Hancock's testimony was clear, credible, and convincing. The Cranes represented to him also that the initial $ 750 premium check was Mrs. Crane's separate property; [13] the premium check form bore both Mr. and Mrs. Crane's names, but a line was drawn through his name. This is some further evidence of their intention to make the policy Mrs. Crane's separate property. *593 We think that the insurance application when viewed in the light of Mr. Crane's statements to Mr. Hancock that he wanted the policy to be Mrs. Crane's separate property show that signing the application was an "affirmative act" which meets the test set forth in Freedman and Parson. Mr. Crane was put to a "conscious decision" between retaining and renouncing his interest in the policy; that he chose to renounce his interest is evident by his statements unequivocally declaring his intention when he signed the application. Respondent argues that the absence of a fully worded control clause in an issued policy dictates the conclusion that Mr. Crane retained the incidents of ownership, citing Bintliff v. Commissioner,462 F.2d 403 (5th Cir. 1972); Parson v. United States,supra, and McKee v. Commissioner,T.C. Memo. 1978-108, as examples of cases in which the courts have found completed transfers of policies documented with more complete control or similar clauses.Respondent further argues that this case more closely resembles Freedman v.United States,supra, and certain Ninth Circuit cases *594 including Kern v. United States,491 F.2d 436 (9th Cir. 1974) and Estate ofMeyer v. Commissioner,66 T.C. 41 (1976), affd. per order 566 F.2d 1182 (9th Cir. 1977), in which the courts found lacking sufficient evidence to support a transfer of the policy. We disagree. We recognize that, in the first group of cases, which respondent seeks to distinguish, the presence of control or similar clauses helped persuade the courts that the requisite donative intent existed. We do not think, however, that the fortuitous presence of a complete paragraph in an application or policy should necessarily determine the result. The question is not the phraseology used by Connecticut General but the intent of the decedent-insured. The importance of a control clause as such is merely evidentiary. The policy application is the instant case gave Mrs. Crane the right to receive and direct the receipt of the proceeds as well as all policy rights. We think that Mr. Crane's intent is adequately evidenced by his statements to Mr. Hancock coupled with his signature on the policy application. Mr. Hancock's unequivocal testimony concerning Mr. Crane's *595 intent as expressed to him also distinguishes the present case from Freedman, and Estate of Meyer in which oral testimony was found unilluminating or insufficient to rebut the community property presumption. Moreover, in Kern the evidence of donative intent was found insufficient in two policies in which the printed form's control clause made no reference to the individuals or their marital status; in a third policy, a typed endorsement specifically referred to Mrs. Kern, and this clause plus oral testimony of the insurance salesman and Mrs. Kern was held sufficient evidence of donative intent. Kern v. United States,491 F.2d at 439. [14]
In sum, we think that petitioners have rebutted the presumption of Texas law that the policy was community property. Taking into account all the evidence, we hold that Mr. Crane gave to Mrs. Crane his entire interest in the policy and that at his death he did not possess any *596 of the incidents of ownership with respect to the policy.Any other conclusion would, we think, disregard the realities and pay homage to a formality. See Parson v. United States,460 F.2d at 232. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.↩
2. Petitioner has conceded many of the adjustments made by respondent in valuing the assets and liabilities in Mr. Crane's estate, so that the assets exceed liabilities by a wider margin than appears on the estate tax return.↩
3. In his notice of deficiency, respondent determined that part of the proceeds was includable under secs. 2042, 2035, or 2036. As he makes no mention of the latter two sections on brief, we treat any argument based on secs. 2035 and 2036 as abandoned. Respondent has abandoned on brief any objection to testimony based upon the Texas "Dead Man's Statute," Tex. Civ. Stat. Ann. art. 3716 (1926).↩
4. SEC. 2042. PROCEEDS OF LIFE INSURANCE. The value of the gross estate shall include the value of all property-- (2) Receivable by other beneficiaries.--To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. * * * ↩
5. Although Mrs. Crane served as the decedent's executrix, she received the proceeds in her capacity as third-party beneficiary, and not as executrix.↩
6. Sec. 20.2042-1(c)(5), Estate Tax Regs., provides in part as follows: As an additional step in determining whether or not a decedent possessed any incidents of ownership in a policy or any part of a policy, regard must be given to the effect of the State or other applicable law upon the terms of the policy. * * *↩
7. Tex. Rev. Civ. Stat. Ann. art. 23(1) (1969), as enacted in 1957 provides: "'Property' includes real and personal property, and life insurance policies and the effects thereof." "Such property is said to be in the nature of a chose in action which matures at the death of the insured." Brown v. Lee,371 S.W.2d 694, 696 (1963); see also Amason v. Franklin Life Ins. Co.,428 F.2d 1144, 1146 (5th Cir. 1970). Prior to the 1957 enactment, "the Texas courts had consistently held that 'policy rights' constitute property but had been unclear about 'proceeds rights'"; that enactment made it clear that "all rights represented by a policy are property rights." Freedman v. United States,382 F.2d 742, 745↩, fn. 7 (5th Cir. 1967).
8. The full text of the control clause in the policy involved in Freedman v. United States,supra at 743, fn. 3, reads as follows: Control. The ownership including all benfits, values, rights and privileges shall belong to the Owner named below, otherwise to the Proposed Insured.↩
9. The assignment form in full reads as follows ( Parson v. United States,460 F.2d 228, 230 (5th Cir. 1972)): COMPLETE ONLY ONE OF THESE SECTIONS I. THIRD PARTY OWNERSHIP If you wish a third party, who has an insurable interest in your life, to own this certificate, complete the following statement: THIRD PARTY OWNERSHIP--It is agreed by the person to be insured that all right and title to the insurance applied for shall vest in and every incident of ownership thereof may be exercised and enjoyed irrevocable without the consent of any other person by: Name of Owner (PLEASE PRINT) /s/ Mrs. Beatrice Smither Parson (Show Given Name--Example, Mary Jones--NOT Mrs. Edward F. Jones) whose insurable interest is Wife (Example, Wife, Son, Daughter, etc.) II. "REGULAR" BENEFICIARY PROGRAM If you wish to retain ownership of this certificate state name of person(s) to whom benefits are to be paid in case of Accidental Death. Name of Beneficiary (Please Print) Relationship (Show Given Name--Example, Mary Jones--NOT Mrs. Edward F. Jones) Signature of Applicant /s/ Geo. W. Parson↩
10. Tex. Fam. Code Ann. sec. 5.22 (1975), provides in part as follows: Sec. 5.22. Community Property: General Rules (a) During marriage, each spouse has the sole management, control, and disposition of the community property that he or she would have owned if single, including but not limited to: (1) personal earnings; (2) revenue from separate property; (3) recoveries from personal injuries; and (4) the increase and mutations of, and the revenue from, all property subject to his or her sole management, control, and disposition. (c) Except as provided in Subsection (a) of this section, the community property is subject to the joint management, control and disposition of the husband and wife, unless the spouses provide otherwise by power of attorney in writing or other agreement.↩
11. The affirmative act required to make an insurance policy the separate property of one of the spouses rather than community property may be taken in signing the application for the insurance. In Parson v. United States,460 F.2d 228, 232 (5th Cir. 1972), the court said: Dr. Parson performed a positive affirmative act which the district court found clearly reflected an intention to make a gift of his community share.It makes no difference, contrary to the government's contention, that Dr. Parson achieved this at the time the policy was applied for. In Prichard v. United States,397 F.2d 60, 64 (5th Cir., 1968), this court stated that "[a] husband may unconditionally make his wife the owner and beneficiary of an insurance policy on his life when it is issued, or later if he desires, so as to bar inclusion of it in his estate." See Mercantile Trust Co. Nat'l. Ass'n. v. UnitedStates,312 F.Supp. 108, 111 (E.D., Mo., 1970). Nor does it matter that Mrs. Parson was the one who placed her name in the space designating the person to whom the policy was assigned, or that the instrument did not contain the words "for the use and benefit of her separate estate." A court must look to the realities of the situation and give effect to substance over form. Prichard v. United States,supra.↩
12. After testifying as to first the telephone conversation with Mrs. Crane and later a meeting with Mr. and Mrs. Crane in which the community property aspects of a life insurance policy were discussed, Mr. Hancock's testimony summed up the conversation as follows: Q. Did Mrs. Crane indicate to you that she wanted the policy to be issued as her separate property? A. Yes, she did. Q. Did Mr. Crane indicate to you that he wanted the policy to be issued as separate property? A. Yes.
Q.Did he said [sic] words or not his head? A. No, we discussed it. I do not remember the exact words, but yes, he agreed that yes, that is what he wanted. Q. Was it a back and forth conversation between you and Mr. Crane? A. Yes, it was. Q. Was he an active participant in this conversation? A. Yes. Q. Did he understand that if a policy were issued, from what you could observe his understanding of the statements, did he understand that if it were issued as her separate property that he would have no interest in it? A. Yes, he did. ↩
13. Petitioners presented evidence (consisting of conversations between Mr. and Mrs. Crane and telephone calls to the bank) concerning an alleged transfer to Mrs. Crane of the joint checking account upon which the premium check was drawn. We make no finding concerning any such transfer. If Mr. Crane gave Mrs. Crane his interest either in the policy or in the initial premium check, as we think he did, ownership of the bank account is irrelevant.↩
14. We note that the result we reach accords with such additional cases as Kroloff v. United States,487 F.2d 334 (9th Cir. 1973) (Arizona) and Estate of Saia v. Commissioner,61 T.C. 515↩ (1974) (Louisiana).